Memorandum of Decision
On September 30, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Frank B. and Kimberly G. to their minor child, Nicholas B. On December 3, 1999, the father, Frank B., filed a motion to transfer guardianship of Nicholas to Marion B., the paternal grandmother. On December 6, 1999, the mother, Kimberly G., filed a motion to transfer guardianship to Murrell G., the maternal grandmother. A consolidated trial of the termination petition and the motions to transfer guardianship took place in this court on May 1, 2000. For the reasons stated below, the court grants the termination petition and denies both motions to transfer guardianship.
FACTS
The court finds the following facts and credits the following evidence. The mother, Kimberly G., was born in 1961. She began to use drugs when she was fourteen. She ultimately became addicted to heroin.
Kimberly married Michael M. in 1987. They had a son, Anthony M., in 1991. In 1992, DCF obtained temporary custody of Anthony because both parents were involved with illegal drugs. In 1994, the maternal grandmother, Murrell G., became Anthony's legal guardian. Anthony has remained in that residence since that time.
In 1995, the mother began a relationship with Frank B. Frank had a long history of arrests and drug involvement. Kimberly and Frank had a son, Nicholas B., on September 26, 1997. Nicholas was born testing positive for cocaine, marijuana, and opiates. DCF obtained temporary custody of Nicholas and placed him in nonrelative foster care. On April 3, 1998, DCF moved Nicholas into foster care with Murrell G. CT Page 5671
At the outset of foster care, the parents regularly attended weekly visits with Nicholas. Beginning in December, 1997, their attendance began to slip. After March 30, 1998, the parents did not appear at visits or respond to DCF attempts to contact them. Between October, 1997 and August, 1998, the father and mother were each arrested at least twice. The parents did not appear at three scheduled administrative case reviews in 1997 and 1998. During this time period, the father did not send any cards, gifts, or letters for Nicholas to DCF.[2]
Although the court adjudicated Nicholas neglected on April 9, 1998, the court did not then or later set expectations or order specific steps for compliance because the parents did not appear in court. DCF did advise the parents, both verbally and in its written treatment plans, that, among other things, the parents needed to attend substance abuse evaluations and follow recommended treatment. Neither parent did so. The father was using as much as ten bags of heroin a day late in the summer of 1998.
By September, 1998, both parents were back in jail. The mother was released from prison in late 1998, only to return in March, 1999. During this time interval, the mother did not obtain drug treatment and in fact resumed using heroin and cocaine. Nicholas had about four DCF-supervised visits with the mother in 1999. The mother displayed good parenting skills but Nicholas and the mother did not have a strong bond with each other. The mother's whereabouts have been unknown since October, 1999. She did not appear at trial.
The father's arrest in September, 1998 represented his thirty-seventh. He ultimately received a net effective sentence of one year for second degree forgery, second degree failure to appear in court, and three counts of sixth degree larceny. The father visited Nicholas in prison in December, 1998 and January, 1999. The father was appropriate with his son, but Nicholas did not show any recognition of him. The father did not request further visits at that time because the prison visiting facilities were too limited. The father did begin some drug rehabilitation work while in prison.
After the father's release from prison in December, 1999, the father obtained additional substance abuse treatment through probation and became gainfully employed. The father had a supervised visit with Nicholas in December, 1999. DCF has declined to provide additional visits, citing the father's failure to contact them with his schedule, the pendency of a psychological evaluation, and the pendency of this trial. CT Page 5672
A psychological evaluation took place on April 7, 2000. The evaluator concluded that the father's capacity for long-term abstinence had only been minimally tested and that the father did not have a close bond with Nicholas. The evaluator accordingly recommended against reuniting Nicholas with his father. Because the father had made some positive strides since his recovery and appeared to relate appropriately to Nicholas, the evaluator felt that continued contact between the father and his son might be appropriate.
Nicholas remained in foster care with Murrell G. until October, 1999. At that time, Murrell became sick with colon cancer and DCF placed Nicholas in foster care with his day care provider. Murrell had some contact with Nicholas during this placement. After surgery and treatment, Murrell's prognosis is now good. DCF returned Nicholas to her home on April 18, 2000.
Murrell, now sixty-one years old, has master's degrees in social work and child welfare and is employed as a medical social worker. She has excellent parenting skills. Nicholas and Murrell are closely bonded and Nicholas considers Murrell to be his mother. Murrell would like to adopt him. If she were able to do so, she would then seek to termination of Anthony's parental rights in probate court in order to free him for adoption and become a permanent parent for both Nicholas and Anthony.
Murrell has permitted visitation by Marion B., the paternal grandmother. Marion disavows any current interest in being a guardian for Nicholas and acknowledges that Nicholas is better off in Murrell's care. Marion's main concern is continued visitation with Nicholas, because he is her only grandson and they have a good relationship. Murrell has pledged that visitation by Marion will continue even if Murrell can adopt Nicholas. Murrell, who has been good at setting limits concerning visitation, would also allow Nicholas to have some contact with his father if the father maintains his recovery.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1).[3] The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with extensions of CT Page 5673 commitment or other permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112 (c)(1). In this case, the court found at an extension hearing on March 5, 1999 that reasonable efforts to reunify the parents with Nicholas were no longer appropriate. Accordingly, the first element of the termination statute has been satisfied.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
The adjudicatory date in this case is September 30, 1998, the date of filing of the original petition. The petition alleges the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against both parents.[4] The court finds that DCF has proven these grounds by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id., 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
Neither parent maintained the requisite degree of interest, concern, or responsibility in his or her child during the adjudicatory period. The parents gradually stopped visiting their son foster care. They did not maintain contact with DCF or attend administrative hearings concerning the case. The father did not send Nicholas any cards, gifts, CT Page 5674 or letters. DCF has accordingly proven by clear and convincing evidence that both parents abandoned Nicholas.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). No dispute exists that, on April 9, 1998, the court adjudicated Nicholas to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
During the adjudicatory period, both parents persisted in a lifestyle of drugs and crime. They did not obtain substance abuse treatment as DCF urged them to do. They abandoned Nicholas, failed to appear in court, and did not contact DCF. This evidence clearly and convincingly establishes that each parent "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1).
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no CT Page 5675 ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced."In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290
(1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
In the present case, the parents stopped seeing Nicholas regularly three months after he was born. After March 30, 1998 they did not see him for the rest of the adjudicatory period. There is little doubt that the parents did not have an ongoing parent-child relationship with him as of September 30, 1998. Further, to allow additional time for such a relationship to develop would not have been in the best interest of Nicholas, especially since both parents went to jail at the end of the adjudicatory period. Accordingly, the evidence establishes the ground of lack of an ongoing parent-child relationship against both parents.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book §33-5.
The motions to transfer guardianship are also dispositional in nature. The court could, if it chose, deny both motions to transfer guardianship on narrow grounds. The mother failed to appear at trial to argue her motion. The father's motion fails because the paternal grandmother is not seeking to become Nicholas's guardian.
While the court places some weight on these considerations, the more important basis for denial is that the best interest of Nicholas favors not guardianship but rather termination of his parents' rights and adoption by Murrell G. There is no real dispute that the court should terminate the mother's parental rights. She abandoned Nicholas soon after he was born and, because of a life of drugs and crime, she remains CT Page 5676 a complete stranger to him. It is also clear Nicholas has bonded with Murrell G., an excellent care taker whom Nicholas regards not as his grandmother but as his mother. All parties essentially agree that Nicholas should stay with her for the foreseeable future.
The father, however, argues that a guardianship would enhance the likelihood that Nicholas would get to know and benefit from the father and the paternal grandmother. For essentially two reasons, the court does not favor this approach. First, the court believes that Murrell G., rather than the father, should have the primary say regarding Nicholas's visitation and contact with other family members. The father has begun to turn his life around, but he has not proven himself for a sufficient period of time. He has good parenting skills but, as a result of his long history of drugs and crime, has no current parental relationship with Nicholas. In contrast, Murrell G. has well exercised her discretion concerning visitation in the past. She has pledged to allow the paternal grandmother to visit in the future. Appropriately, she will consider letting Nicholas see his father when he has recovered sufficiently.
Second, termination of parental rights will allow Murrell to adopt Nicholas. Adoption will maximize the likelihood that this young boy will remain in the same home for the rest of his childhood. Given the additional presence of his half-brother Anthony, whom Murrell may also be able to adopt, Nicholas is likely to grow up in the happy and stable environment that is best for him.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691, 741 A.2d 873
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
As stated above, from the outset of the case DCF has offered the parents visitation and referrals to substance abuse treatment, but the parents did not take advantage of these opportunities.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980. CT Page 5677
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court did not enter expectations or specific steps for the parents because they did not attend court at the time.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Nicholas is strongly attached to his maternal grandmother. He has no parental attachments to his natural mother or father.
5) The age of the child.
Nicholas will be three years old on September 27, 2000.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in Nicholas's best interest to return to their home and that they had only limited contact with him and DCF.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances. CT Page 5678
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petition and denies the motions for transfer of guardianship. The court orders that the Commissioner of DCF is appointed statutory parent for Nicholas for the purpose of securing an adoptive family. The court strongly recommends that the maternal grandmother, Murrell G., be allowed to adopt Nicholas. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
 Carl J. Schuman, Judge, Superior Court